Thank you, Your Honor. May it please the Court, my name is Larry Sackey. I'm representing the appellant, Dr. Saeger, in this matter. Your Honor, there's been quite a lot of briefing, quite a lot of facts that have been put into all the briefing. In the court below, there were over 130 facts, and only 80-some of those facts were determined by the court. How much money is at issue in this? Your Honor, probably because of the fact that these policies are held over years and years and years, we're talking over well over 30,000 to 40,000 or plus. It really depends. This action was filed in the year 2000. Each time, a policyholder, because this is brought as a class action. Now, how much did your client, how much did he pay you, how much was his annual premium? He paid a single premium payment of over 350-some thousand dollars, is approximately 15 to 18 thousand dollars. Dr. Saeger is representing himself and on behalf of a class of policyholders. Well, but let's look at his claim. So it's 15 to 18 that he... That is correct. Now, that could increase, because this is what's called a flexible premium policy, which means that during the course of the time that Dr. Saeger has this policy, he does have an option to pay additional premium payments. Now, he knew the comparable policy from other companies doesn't have this charge, right? He knew that there were other policies that he looked at that included the language that this charge was related to a DAC charge. He did not know that this policy was a DAC charge. And that can be illustrated quite simply by referring to the language of the imposition of the federal tax charge in Dr. Saeger's policy and the later policy that Pacific Life issued, which did in fact inform intelligently potential investors in this policy what this charge was for and that it was material. What was stated in this policy was, and the only thing that was stated in this policy, was that we deduct 1.5 percent from each premium payment to pay federal taxes. Now, is that literally false? It is literally false in the sense that there is no federal income tax. It doesn't say income tax, so let's stick with the literal language. It's clearly ambiguous. So it's not literally false, I take it. There is some impact in the payment of an insurance company's income tax as a result of the imposition. What was the phrase again? We deduct 1.5 percent from each premium payment to pay federal taxes. Okay, that's not literally false. It is not literally false. It is, however, misleading in the sense that it implies to the reasonable policyholder that that is related to what is considered to be a federal premium tax. It is a premium tax. Okay, now how is that material, that it was... It is material. ...an income tax or a premium tax and not some other type of federal tax? The phrase goes on. We reserve the right to change this rate to respond to changes in the law. Now, what the court determined in her findings, and it is in the findings, the court, at the district court level, said plaintiff offers no evidence that the defendant uses the charge to pay for something other than federal tax. However, what was disclosed accurately to policyholders in the 2004 iteration of the same policy, inasmuch as the original 2000 policy is open-ended, it can be changed, is that we deduct 1.5 percent of each premium to compensate us for certain costs or lost investment opportunities. We incur associated with certain policy acquisition expenses that we are generally required to capitalize and amortize over a 10-year period rather than deduct them. That's what they changed it to, right? They changed it to. My question is, why is it material that the original prospectus worded it the way it did instead of the way you would have it worded? Any investor, any policyholder, especially in a product such as this, where people usually purchase for a number of years, wants to know how their policy costs and fees will change. It is clear that the charge imposed here in the 2000 policy was to pay federal taxes. However, what Pacific Life has admitted in the second iteration, which it also claims to be true and but Rubinesque, is the fact that it's not just to pay federal income taxes, that it is related to DAC. I'm not getting the answer to my question. It says it's going to be 1.5 percent for policy. Correct. It says we can change it as developments warrant or something like that. It's more than just developments, Your Honor. Whatever it says. It says to compensate us for... To respond to changes in the law. Okay. Now, why is it material that they worded it the way they did instead of the way you would have them worded? It looks to me like as long as they tell you it's going to be 1.5 percent and that it might change, that's the significance of it. Well, we don't know in the future whether or not, based on its reservation to respond to changes in the law, that it's going to be limited to their payment of income taxes. I thought you said it was a single premium. I'm sorry, sir? Didn't you say it was a single premium? This particular policy... Well, that's the one you're representing. This single premium wasn't going to be changed. Correct? Dr. Sager has the right, with this type of a policy, to add additional premiums. He is a holder of that right so long as the premium maintained... Then I assume if he added and bought more, he'd find more out about it. But as far as this, the amount of insurance he bought, he paid the premium for it. It wasn't going to change. Correct? Not necessarily correct. Why not? Because he has the right, in a flexible premium policy such as this, to add additional premiums during the life of the policy, as other thousands of policyholders who pay on a monthly basis or a semiannual basis or an annual basis also do. It is in its core an insurance product. But he won't do that until he knows what the premium is, will he? When he purchased this policy, as in any investor, you want to know, is this going to be a solid fixed fee, such as the 4% fee, administrative fee, that's also included in the same section, premium load charges? Well, he's told that this will change. He's told to respond to changes in the law. There is no law that's referenced in the original 2000. If he finally decides to put more money in it, I assume he'd find out whether there was going to be any change and what was responsible for it. He also believes, based upon the representation and the omission here, that it's limited to payment of federal taxes, some federal taxes. However, if you look at the 2004 disclosure, it's not limited just to federal taxes. It also includes compensation to the company for its lost investment opportunities and other costs, which is based on what they call a hurdle of 12% return on investment. These are internal decisions, projections made by the company, which involves whether or not that 1.5%, which they mislead people to believe, is related to a federal premium tax, which is a fixed charge. It's like a state premium tax. It's like fixed administrative costs. Anytime you agree to give a company discretion to raise rates and are not told in the correct law that applies, DAC, and that it also involves other potential costs and that it also involves an internal decision made by the company on what they want their return of investment to be. For example, your honors, in today's economic climate, that 12% rate is based upon, in part, what the company is expected to achieve in its separate accounts. It's stock investments. It's mutual fund investments. It's bond investments. By that drastically changing, is there anything to limit in the actual wording of what was stated to Dr. Sager, that they are limited to some change in some unknown law? An investor, in this instance, I mean, we're talking about disclosure here. What's required under the securities law? He's not required to go out and compare every policy on the marketplace. It's misleading. And the fact is that they knew it was misleading. They knew its effect upon policyholders because they hired a plain English language expert who also believed it to be a federal premium tax. Pacific Life had the opportunity, not to continue knowing that it was misleading its investors, but rather stayed with the same language that it had had going back to 1996. That was a fact that was totally ignored by the district court judge. It wasn't even mentioned by the judge as anything that was disputed. That's indelible. There is no other evidence of the effect of that phrase on policyholders except for their same, Ms. Gordon, the plain English language expert's belief, the same as Dr. Sager, the same as his advisor, Mr. Seif, who believed, and there is evidence on the record, that this was akin to a sales tax, a pass-through tax, where the company could not profit from that tax. Those disputed facts, those were material. And those disputed facts, although showing an internal conflict in deposition testimony, weren't even cited by the court. Do you want to save three minutes for rebuttal? Yes, I do. Thank you. Thank you, Mr. Seif. Good afternoon. Good afternoon. It's David Bacon for Pacific Life Insurance Company. Shakespeare wrote a play titled Much Ado About Nothing. This lawsuit, which has lasted now for over six years, is essentially nothing to do with his Much Ado About Nothing. The SEC took a very close look in the mid-1990s at life insurance companies' exemptive applications to make charges against premiums on variable life policies for the economic impact of Section 848 of the Internal Revenue Code. And the record is full of quotations and cites to SEC documents and orders referring to federal tax charge, referring to increased federal income tax burden in the insurance companies. We've included in the record an SEC order and an exemptive application by Security Life of Denver, which sought permission to deduct a 1.5% charge. And the application, which was approved by the SEC, set forth the rationale. The rationale is based on a projected 35% marginal rate of return, excuse me, federal income tax rate and a 12% anticipated rate of return on investment. When the insurance company would compute and the SEC would approve a charge, the first component of the charge would be what is the increased federal income tax for the insurance company resulting from the charge. And then the second component is, and this is because deductions are deferred over a 10-year period, what is the present value of these future deductions. And it's when the insurance company calculated and the SEC approved the charge for the, excuse me, approved this element for the deduction and that the insurance company's rate of return on investment comes in. And the figure, the 1.5% calculation that Pacific Life used was exactly the same one that Security Life used and was approved by the SEC. The record also shows that the dot tax charges by insurance companies were in the 1% to 2% range and Pacific Life's 1.5% charge is squarely in the middle. What was the dollar amount of the premium in this case? I think that the roughly 340,000 was paid by way of a single premium payment and the Say that again, how much? I believe that there was a single premium payment of about $340,000 and then there would have been a 1.5% charge against that which would take you out to about $7,000. I thought he said $18,000 or something. He did. $7,000 would say the premium was. It was a 1.5. That seems to make more sense. That's a matter of arithmetic. But the premium is $350,000. The 1.5% sounds. It couldn't have been $18,000. It was not that high. It would be a simple mathematical calculation of 1.5% times the premiums paid. I was really struck. Neither brief seemed to pay much attention. I would have thought the amount of money deducted was of some materiality, but it was treated as though it was incidental. The amount was very small. Where materiality comes in in part would be the fact that Pacific Life made a full disclosure that Nature amount and purpose of the 1.5% charge consistent with the SEC's plain English rule. Pacific Life did not add in a lot of technical jargon. But you have to admit that it deceived your own plain English or plain language expert. She thought it was a tax charge. Well, the Canadian committee, Ms. Gordon thought that the, was looking at this not from a legal standpoint, she's not a lawyer, but from the standpoint of trying to simplify the English. And she thought that, why use four words, charge for federal taxes, if in fact it's a tax, why not just use the word federal tax? Well, that's the way many investors might have thought too. They're not lawyers either. She came from a background where Canada has a federal premium tax. In the United States, the record shows that insurance actuaries commonly refer to the tax charge as a federal premium tax. Well, unless you were in the business, you wouldn't have known. And we've also shown in the record that 17 other life insurance companies use the term federal premium tax. It's not a term I would choose, but it's a fairly apt description of what happens. Because the company's increased federal tax liability is measured at the outset by, with respect to variable life policies, 7.7% of premiums collected. So it's a tax impact that is based on the amount of premiums paid. That is how you measure it, and insurance actuaries who spend their life dealing with these concepts, in a shorthand manner, generally refer to this or very often refer to this as a federal premium tax. As far as I know, the SEC has never objected to any of the prospectuses filed by other companies which use the term federal premium tax. In any event, Pacific Life didn't use that term. It had been suggested by the plain English consultant, and the record shows that Pacific Life stepped in and said, no, we're not going to call it a federal premium tax. It's a charge. We're going to call it a charge. And that's the language that's used, and that's the language that this Court should look at when it determines whether there was falsehood, materiality, sanctuary, and the like. The language that Pacific Life used, federal tax charge, is identical or very similar to the language used by more than 70 other companies. They use terms like federal tax charge, federal income tax charge, or charge for federal taxes. All of those phrases very aptly describe what is going on here. Namely, they describe the reason why the company is taking a deduction against premiums in the 1% to 2% range. The record also shows that Pacific Life's federal corporate income taxes were more than tripled in the year 2000 on account of the impact of the DAC tax. The year 2000 is the year in which Dr. Sager bought the policy. So there's no misappropriation of funds. Nothing inequitable occurred. There's no ill-gotten gain on the part of Pacific Life that would be subject to equitable restitution. Is the policy still in force? I didn't hear. I'm sorry? Is the policy still in force? Yes, as far as I know. It's still in force. In looking at the – I do a lot of work in litigation involving taxes, and we cite the dictionary references on page 33 of our answering brief. If you take a look at – for words like Section 848 of the Internal Revenue Code, DAC tax, or deferred acquisition costs in standard tax law treatises like the CCH US Master Tax Guide or the Klein and Bankman Federal Income Taxation, you won't find them there. So I would doubt that the average tax lawyer who doesn't handle life insurance taxation is familiar with terms like DAC tax, Section 848 of the Code, or deferred acquisition costs. We also took a look at the Webster's New Collegiate Dictionary, the Dictionary of the English Language, and Black's Law Dictionary. And even if an investor thumbed through those dictionaries looking for words such as deferred acquisition costs, Internal Revenue Code, Section 848, or DAC tax, he or she wouldn't find them there. So if those words aren't even in standard tax law treatises or standard dictionaries, including Black's Law Dictionaries, I don't really think that the average investor is going to know what those words mean or if they were tossed at the average investor, that the average investor, if he or she scurried to a dictionary to try to get more meaning, that anything would come of it. They're simply not there. These are unusually specialized words. Section 848 of the Code only applies to life insurance companies. It has no application outside that. If you talk to an average tax lawyer who doesn't do life insurance company work, he or she is not going to know what Section 848 is. They're not going to know what the DAC tax is. They're not going to know what deferred acquisition costs mean in this context. The thrust of this lawsuit is to make it a violation of federal securities law. Securities fraud, not to use terms that aren't even in these dictionaries. The thrust of the lawsuit is to make it a federal securities violation, namely securities fraud. To use terms that an average investor simply is not going to understand. And if the average investor were to take the time to try to look those words up in standard resource sources, the average investor won't even find them. All this goes to materiality. It also goes to intent to defraud, Santerra, and it also goes to damages. There are absolutely no damages in this case. No way Dr. Seeger could have obtained any variable life policy which did not reflect a charge between 1% and 2% for the impact of a DAC tax. The only policy after six years of research that anyone found where there's a reference to a type of tax charge and no breakdown between a state premium tax and a federal tax charge is the Hartford policy. It was recommended by Dr. Seeger's stockbroker. The Hartford policy is heavily commissioned. The record shows Dr. Seeger himself recognized that. The load is 10%. It's 2% – excuse me, it's 8% for sales tax – excuse me, for the sales load, and there's a 2% for a premium charge. And the civic life policy, the total premium load was 6.35%. Dr. Seeger and his consultant, Michael Seethy, made the correct decision not to go with Hartford. Instead, they looked at a total of seven different policies, including Hartford and Pacific Life. And for those policies, the consultant described as low-load policies. Pacific Life was chosen for essentially three reasons. One, it was a very low-commission policy. Two, the projected value increase over both 10- and 20-year periods was greater than the other policies. And thirdly, Pacific Life was a significantly larger and more highly-rated company than Ameritas, which was considered to be the next best low-load policy. Over a 20-year period, Pacific Life was projected to perform $92,000 better than Ameritas. And one final comment, although the other side complains that Dr. Seeger had no idea what the tax was or what type of charge was being imposed here, the record shows that both he and his consultant clearly understood that the charge being imposed by Pacific Life was an internal charge that's being passed on to the federal government that puts it in a far different category than a state premium tax or a state sales tax. And they also knew from the Ameritas policy that the – let me get the language for you for a minute, please – that Ameritas referred to a 3.5 percent charge for state premium taxes or federal income taxes associated with the deferral of acquisition expenses. So both Dr. Seeger and his consultant had before their noses what they now claim they didn't understand or know, namely that the federal charge involves federal income taxes associated with the deferral of acquisition expenses. We discussed this at the answering brief on page 8. Unless the Court has questions, I'll be finished. Thank you, Mr. Baker. Thank you. Damages were not an issue in the motion for summary judgment. But it was about $7,000 you paid the judge. Yes, I made a mathematical error. In fact, what my co-counsel indicated to me was around 150 – I'm sorry, $358,000. My math was off. I agree. This case was brought under SLUSA as a class action. Damages were not an issue. It was not an issue that was decided by the Court. It wasn't brought up in the initial motion for summary judgment by the defendant. Many other companies, most other companies, in explaining a charge to compensate it for payment of its lost business opportunities, use the phrase DAC, deferred acquisition costs, and they explain it in detail. In 1996, two years before imposition of the plain language, consultant is hired. They explained it as a federal tax charge. This policy refers to the federal tax charge in italicized portions before it is said to the policyholder. The SEC, as has been admitted to by the defendant's attorneys, whatever the SEC agrees to after a statement is filed, they do not in any way represent that the language used by the company is correct. In fact, there's a warning that's included in the prospectus to potential investors for that reason. The security life of Denver policy used deferred acquisition costs. That would tip somebody off to know that that is a fluctuating charge, and it makes it so much more important in the language that Pacific Life used, to Dr. Sager here, because they reserve the right to change that rate. Certainly an investor would want to know in policy fees that could be changed in the future, that these charges could be made not only to pay federal taxes, but also to help itself with its return on investment, which is internal to the company. None of these things were told to the investors. These are omissions. Just look at the two languages side-by-side and see how different they are. Thank you very much.  Mr. Sacky, Mr. Bacon, thank you as well. The case argued is submitted. Thanks.
judges: Noonan, Silverman, Conlon